The **BROOKLYN HOSPITAL**, a New York non-profit corporation, Plaintiff,

v.

**Richard S. SCHWEIKER, In His Official Capacity As Secretary of Health and Human Services, Defendant.**

**No. 82 Civ. 1225.**

United States District Court, E.D. New York.

Oct. 24, 1984.

Milbank, Tweed, Hadley & McCloy, Andrew J. Connick, New York City, Wood, Lucksinger & Epstein, Michael H. Cook, Washington, D.C., for plaintiff.

Asst. U.S. Atty., Patrick Northup, Brooklyn, Eastern Dist. of N.Y., for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Plaintiff and defendant have cross-moved for summary judgment on plaintiff's appeal from a final decision of the Secretary of Health and Human Services regarding reimbursements for services provided to Medicare beneficiaries. Specifically, plaintiff challenges the Secretary's determination on three of six categories of costs claimed by plaintiff under the Medicare Act for which the Secretary disallowed reimbursement: interest income offset, information desk costs, and labor/delivery room cost apportionment. For the reasons which follow, summary judgment is granted in favor of the defendant on all three issues.

### I. *Statutory Background*

This case arises under the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq. Under Part A of the program covering hospital insurance, 42 U.S.C. §§ 1395c, et seq., "providers of health care services," to eligible beneficiaries are reimbursed by the federal government through private organizations acting as "fiscal intermediaries." 42 U.S.C. § 1395h. Reimbursement is based on the lesser of the provider's reasonable cost or its "customary charges" for rendering the covered services and its actual costs. See 42 U.S.C. § 1395f(b).

■ In calculating a provider's "reasonable costs," there are three relevant reference points. 42 U.S.C. § 1395x(V)(1)(A) broadly defines such costs as "the cost[s] actually incurred excluding therefrom any part of incurred cost[s] found to be unnecessary in the efficient delivery of needed health services." More specific guidelines are provided in regulations promulgated by the Secretary, *see* 42 C.F.R. §§ 405.401, et

seq. In addition, the Secretary issues a Provider Reimbursement Manual, Health Insurance Manual 15 (HIM–15), which interprets the Medicare reimbursement regulations. Although the agency's interpretation of its regulations is entitled to considerable deference, *see Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965), the court still must determine whether the interpretation is consistent with the language and purpose of the regulations, *Northern Indiana Service Co. v. Porter County Chapter of the Izaak Walton League of America, Inc.,* 423 U.S. 12, 15, 96 S.Ct. 172, 173, 46 L.Ed.2d 156 (1975), and whether the regulation itself is consistent with the statute. *United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977); *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974).

A preliminary determination regarding the amount of reimbursement due to a provider, or the method of its calculation, is made by the fiscal intermediary, based on a "cost report" submitted by the hospital at the close of the fiscal year. *See* 42 U.S.C. §§ 405.406(b), 405.454(f). If a provider disagrees with this determination, it may obtain an administrative hearing before the Provider Reimbursement Review Board ("PRRB"), 42 U.S.C. § 1395oo; 42 U.S.C. § 405.1835, which can make an independent evaluation of the intermediary's decision. 42 U.S.C. § 1395oo (d). The decision of the PRRB becomes final unless the Secretary on her own motion and within sixty days after the Provider is notified of the decision, reverses, affirms, or modifies the decision. 42 U.S.C. § 1395oo (f)(1).

■ The final decision of the Board or the Secretary may be appealed to the District Court under 42 U.S.C. § 1395oo(f)(1). The scope of judicial review under this section is governed by the applicable provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, et seq. Section 706(1) of the APA provides that:

The reviewing court shall ... (2) hold unlawful and set aside any agency ac-

tion, findings, and conclusions found to be ... (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, ... [or] (E) unsupported by substantial evidence ....

In making the foregoing determination, the court shall review the whole record or those parts of it cited by a party ....

In applying the standards of 5 U.S.C. § 706 to review an agency's actions, a court may not substitute its own judgment for that of the Secretary solely because the court might have arrived at a different decision. *Home Health Services of the United States, Inc. v. Schweiker*, 683 F.2d 353, 356 (11th Cir.1982). Moreover, where "the agency interpretation of its own regulations is reasonable, it must stand even though it may not appear as reasonable as some other." *Homan & Crimen, Inc. v. Harris*, 626 F.2d 1201, 1208 (5th Cir.1980). On the other hand, a reviewing court is not bound by such an interpretation. "The weight of such a judgment in a particular case will depend on the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier or later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). As to medicare cases in particular, the task of the district court was summed up by the Court of Appeals for the D.C. Circuit as follows:

A reviewing court may not set aside the agency interpretation merely because another interpretation ... seems better, so long as the agency's interpretation is within the range of reasonable meaning that the words of the regulation admit.

*Psychiatric Institute of Washington, D.C., Inc. v. Schweiker*, 669 F.2d 812, 814 (D.C.Cir.1981).

I will now address separately the facts and the legal authority regarding each of the three issues on which plaintiff has appealed an adverse decision by the Secretary.

## II. *Discussion*

### A. *Investment Income Offset*

The first issue raised is whether the revenue generated by plaintiff's investment of monies in its operating fund checking account (the "float") was properly offset against medicare reimbursement for plaintiff's allowable interest expenses. An official for the hospital testified that the float is invested "in various types of commercial paper ... and we earn investment income while those finances are not deducted from our bank account at the bank." Tr. at 15, 24, 30. The intermediary's determination that this income should be offset against interest expenses was based on Subsection 222.2 of Part I of the Provider Reimbursement Manual, which requires that:

[w]here the provider has invested funds from gifts or grants which are unrestricted as to use, and these funds are co-mingled with other funds, the provider's allowable interest expense is reduced by the amount of the investment income earned by the fund.

Record at 1068, 1082.

■ The intermediary found that the interest accumulating in the checking account constituted "investment income" within the meaning of Subsection 222.2, citing 42 C.F.R. § 405.419(b)(2)(iii) which provides, inter alia, that in order to be necessary (and thus recoverable), the interest must "be reduced by investment income except where such income is from gifts and grants, whether restricted or unrestricted, and which are held separate and not co-mingled with other funds." Section 405.-419 comports with 42 U.S.C. § 1395x(V)(1)(A) set forth above. The decision of the intermediary was affirmed, without decision, by the Deputy Administrator of the Health Care Financing Administration, acting on behalf of the Secretary. Record at 19.

On appeal to this court, plaintiff argues that the Secretary's decision was in error insofar as it was based on a determination that the income accumulated by the cash management program was "investment in-

come" within the meaning of 42 C.F.R. § 404.419. According to plaintiff, this section was designed to prohibit the reimbursement of expenses incurred through *unnecessary* borrowing. This is evidenced by the placement of § 404.419 under the definition of the word "necessary" as well as by the fact that the intermediary limited the use of the offset provision to the reduction of interest expense reimbursement, rather than to all operating medicare reimbursements generally. *See, e.g.*, Section 222.2 of the Provider Reimbursement Manual ("any investment income in excess of interest expense should not be used to offset other operating expenses"); Tr. at 24–37, 39, 50.

Plaintiff draws support for its reading of the regulations from *Illinois Central Community Hospital, Inc. v. Schweiker*, (D.D.C. July 10, 1981), [1981–82 Transfer Binder] Medicare and Medical Guide (CCH) ¶ 31,421. *Illinois Central* overturned the Secretary's offset of interest income earned from a remodeling and improvement fund, based on the court's finding that this did not constitute "investment income." According to the court, the rationale of § 404.419 was twofold: first, it assumes that the provider will not borrow when it has available investment funds that could be expended in place of borrowed funds; second, it guarantees that providers will borrow only what is needed to fulfill their needs. *Id.* Since these purposes were not thwarted by Illinois Central's earning of interest income, the court deemed the offset to be clearly erroneous.

The decision in *Illinois Central* is distinguishable on its particular facts. The principal in the investment fund at issue here, together with earned interest, remained in a separate fund so that it was never actually handled by the provider. The court indicated that when separation of funds terminated, and this interest became available to the provider, the interest "would unquestionably be 'investment income,' and could be used to offset interest expenses." *Id.* at 9120. The implication of this statement is that the court's holding might differ where,

as here, the interest income is immediately available to the provider.

The application of *Illinois Central* to the present case is further weakened by two other recent Circuit Court opinions that give a more expansive reading of the purposes underlying 42 C.F.R. § 404.419. In *Cheshire Hospital v. New Hampshire-Vermont Hospital Service*, 689 F.2d 1112 (1st Cir.1982), the court upheld an offset of interest income generated by a Debt Service Reserve Fund, which was created pursuant to a bond issued to finance construction of a hospital. The court determined that the purpose of the offset provision was not limited to that outlined in *Illinois Central*, but rather extended to the more general purpose of insuring that providers are reimbursed only for costs actually incurred. 689 F.2d at 1119. According to the court, the Secretary properly sought to achieve that purpose by limiting the provider's recovery to "net costs of its borrowing, i.e., cost of such borrowing less any benefit derived therefrom." *Id.*

The reasoning in *Cheshire* was cited in *Abbott-Northwestern Hospital, Inc. v. Schweiker*, 698 F.2d 336 (8th Cir.1983), where the court sustained an offset of interest income that resulted from an overpayment of FICA allowances to the Internal Revenue Service. The court determined that 42 C.F.R. 404.419 did not address the case fully, but found nevertheless that the Secretary's interpretation of the regulation was not clearly erroneous. *Id.* at 342–43. Furthermore, the Secretary's ruling was found to be consistent with the overall statutory goals outlined in *Cheshire*. *Id.* at 343. In so holding, the court rejected the plaintiff's contention, similar to the one advanced here, by stating that "investment income" would be offset, the regulation precluded the offsetting of other types of interest income. *Id.* at 340–41.

■ Plaintiff seeks to distinguish *Cheshire* by arguing that there, unlike here, the funds from which income was generated were created from the borrowing for

which the provider sought reimbursement.[1] This distinction is only meaningful, if plaintiff is correct in asserting that the purpose of the offset provision is to avoid unnecessary borrowing expenses. As indicated in *Cheshire, supra,* the provisions are also designed to limit recovery for medicare to net costs actually incurred. In order to achieve the latter goal, the Secretary need not limit offsets to interest income derived directly from borrowed funds.

█ Plaintiff challenges *Cheshire's* interpretation of the purpose of the offset provisions on two grounds: first, plaintiff cites a Provider appeal decision and a memorandum issued by the Federal Agency asserting that the purpose of the offset provisions is to avoid needless borrowing, *see* Plaintiff's Memorandum at 13–15; second, plaintiff points to other similar circumstances in which income offsets have not been applied, such as for profits generated by investment in non-patient care related ventures, or where the income exceeds interest expenses. *See* Plaintiff's Reply Brief at 7–8. Plaintiff contends that these discrepancies can only be explained by its theory that the government only seeks to recover investments resulting directly from the participation of its own funds. The broad language of § 1395x(V)(1)(A) limiting reimbursement to "costs actually incurred" contradicts this interpretation, however. The fact that the Secretary has not chosen

to enforce this statutory language with equal vigor on all occasions does not imply that her actions in this case were clearly erroneous. Therefore, the decision to offset the income earned by the Cash Management Program must be affirmed.

### B. *The Information Desk*

The service of the Information Desk is one of numerous non-revenue producing costs for which an accounting method has been adopted to determine the appropriate level of medicare reimbursement. Traditionally, such administrative costs would be accumulated in a capitalized General and Administrative cost center and then allocated on the basis of accumulated costs to revenue-producing cost centers, such as routine services, ancillary care, outpatient clinics and emergency room facilities. The amount of medicare reimbursement would then be calculated according to the percentage of medicare patient use at the revenue-producing cost centers. *See* HIM.–15, § 2310 & § 2313. In 1975, the government provided an alternative method by which the provider could choose to separate administrative costs within the General and Administrative cost center into five designated components and then allocate these costs by means of prescribed accounting methods to revenue-producing cost centers. *See* HIM.–15, § 2313.1.[2] Providers who

---

**1.** Plaintiff also attempts to distinguish *Abbott-Northwestern, supra,* on the ground that this case involved the accrual of interest on "mispaid" rather than borrowed funds. *See* Plaintiff's Reply Memorandum, at 6–7. I fail to see the relevance of this distinction. If anything, the argument against income offset was stronger in *Abbott-Northwestern* than in the present case since, absent an award of interest, the mispaid funds would be worth less, in constant

dollars, at the time of their recoupment than when initially paid over to the Internal Revenue Service. In any event, *Abbott-Northwestern* is still relevant to this case as supporting the general proposition that the Secretary may limit the Provider to net income expenses, after allowance for any interest income.

**2.** The designated component cost centers and their allocation bases are as follows:

| Component Cost Centers | Allocation Bases |
| --- | --- |
| (a) Non-Patient Telephone | Number of non-patient telephone lines or number of instruments. |
| (b) Data Processing | Machine time |
| (c) Purchasing, Receiving Stores | Costs of Supplies Expended |
| (d) Admitting | Gross In-patient charges |
| (e) Cashiering, Accounts Receivable, Collections | Gross Charges |
| (f) Other Administrative Expenses | Accumulated Costs |

chose this option could also formulate alternatives to the designated allocation bases if they could demonstrate that the alternatives yielded a more accurate method of cost allocation, provided that all five of these cost bases were either utilized or substituted for HIM.–15, § 2313.

In the present case, plaintiff has not exercised the option contained in § 2313.1. Instead, since 1966, it has utilized the General and Administrative cost center, while maintaining an independent cost center for the Information Desk. Under the plaintiff's plan, the costs attributable to the Information Desk were allocated directly to the revenue-producing cost center of routine services costs, while the other administrative costs were gathered in the General and Administrative cost center and then allocated to revenue producing cost centers throughout the hospital, consistent with the traditional accounting method. In so doing, plaintiff was able to increase the medicare reimbursement for the Information Desk, since medicare beneficiaries have a higher utilization rate for routine services than for the other revenue-producing cost centers. In support of this action, plaintiff argued that, given the location and purpose of the information desk, its services were targeted exclusively for visitors of inpatients rather than for other hospital facilities. *See* Plaintiff's Reply Memorandum, at pp. 14–16. Therefore, according to plaintiff, it would be inappropriate to allocate this cost to revenue producing cost centers throughout the hospital. *See* Plaintiff's Brief.

■ The Secretary disallowed the plaintiff's method of cost accounting for the Information Desk for the years 1975–1977, and instead, reclassified these costs as administrative and general costs. Plaintiff now argues that this action was inconsistent with the following provisions: (1) 42 C.F.R. § 405.453(d)(2)(ii), which provides that "[a] more sophisticated method designed to allocate costs more accurately may be used by the provider upon approval by the intermediary;" (2) 42 C.F.R. § 405.-453(d)(1), which provides that "[a]ll costs of non-revenue producing cost centers are allocated to all centers which they serve;" (3) Section 2320 of the Manual, which provides that "[b]ases other than those recommended ... may be used with the intermediary's approval, provided such bases will produce more accurate results.[3]

■ The citation of these provisions is based on the mistaken premise that the plaintiff's method of cost accounting is more accurate than the adjustment made by the Secretary. The reality is that plaintiff can at best prove that its system is more accurate as to the Information Desk alone. As to the provider's costs as a whole, it is clear that the Secretary's alternative approaches represent a more rational method of cost reimbursement. The regulations and manual provisions outlined above permit the provider either (1) to use a general but inaccurate accounting meth-

---

**3.** Defendant contends that plaintiff's reliance on the Manual provision would be unavailing even if its accounting method were more accurate than the Secretary's since plaintiff failed to obtain the intermediary's approval beforehand. The need for prior approval is evidenced by 42 C.F.R. § 405.453(d)(2)(ii), which states that

> a more sophisticated method designed to allocate costs more accurately may be used by the Provider upon approval of the intermediary .... Written request for the approval must be made on a prospective basis and must be submitted before the end of the fourth month of the prospective reporting period.

In response plaintiff argues first, that since the Patient Information Desk services only routine cost centers, rather than several cost centers, there was no need for prior approval of its

cost allocation, *see* 42 C.F.R. § 405.453(d)(i) (requiring that non-revenue producing costs be allocated only to cost centers that benefit from these costs); and second, that even if prior approval was required, the Intermediary's acquiescence in plaintiff's methodology in earlier fiscal years served to satisfy this requirement.

This Court agrees with plaintiff that reliance on the prior approval requirement would be tenuous in light of the Secretary's prior acquiescence in plaintiff's methodology. Nevertheless, to prevail on its appeal, plaintiff must demonstrate not only that its actions were consistent with the regulations, but also that the Secretary's adjustment was arbitrary and capricious and clearly erroneous or contrary to law. For the reasons indicated in the text, plaintiff has failed to sustain this burden of proof.

od for all its costs, with the implicit assumption that the instances of over-reimbursement will be balanced by instances of under-reimbursement; or (2) to formulate a more accurate method of calculating *all* administrative costs, so as to minimize inaccuracies. *See* HIM.–15, § 2313.[4] In adjusting the plaintiff's plan, the Secretary has prevented the plaintiff from skewing the first of these alternatives by removing the one cost for which plaintiff stands to gain by use of a more accurate accounting method.[5]

Plaintiff contends that in removing the Information Desk costs from the overall system, its actions paralleled those of the Secretary in other instances, such as reimbursement for malpractice insurance costs, where a special accounting method was employed after the Secretary discovered that the normal method of reimbursement led to inaccuracies unfavorable to the Secretary. *See* Plaintiff's Reply Brief, at pp. 21–24. While these references tend to explain the action of the provider in the instant case, they do not justify a reversal of the Secretary's adjustment. If anything, they call into question policies and practices of the Secretary adopted elsewhere that are not before this Court. As to the practice challenged in this action, for the reasons already stated, I find that the Secretary has not acted arbitrarily, capriciously, or contrary to law. Therefore, the Secretary's adjustment must be affirmed.

## C. *Labor/Delivery Room*

In its audit adjustment for the year ending in 1977, the intermediary, and later the Secretary, required plaintiff to include labor room days as part of the total in-patient days in the computation of general routine per diem costs. The labor/delivery room is one of several ancillary care areas, the costs of which must be apportioned to revenue producing cost centers for purposes of calculating medicare reimburse-

**4.** There are two exceptions to the requirement that all administrative costs be calculated under the proposed new methodology: (1) where a Provider does not maintain one of the component cost center departments, it can use less than all of the component cost centers. HIM–15, § 2313.1.c.2.a, Attachment 3; (2) where two or more cost centers are combined in the Provider's accounting system and it is not feasible to separate them, a combined cost center may be established if, in the intermediary's opinion, the allocation used results in a more appropriate and accurate allocation than the "Accumulated Costs" basis. HIM–15, § 2313.1.c.2.b, Attachment 3.

**5.** Plaintiff contends this and several other arguments put forth by defendants regarding the Information Desk cannot be raised on appeal because they were not relied on by the Secretary in the Deputy Administrator's decision. *See* Plaintiff's Reply Memorandum, at pp. 12–13 (need for plaintiff to provide precise statistical studies); 16 (reliance on HIM–15, § 2313), 20 (need for prior approval from the Secretary); 21 (averaging theory). In support of this contention, plaintiff cites *National Labor Relations Board v. Yeshiva University*, 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980), in which the Supreme Court, in reviewing a decision of the National Labor Relations Board, declined to consider a legal theory not raised before the Board. *Id.* at 685–86 n. 22, 100 S.Ct. at 863–64 n. 22 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)).

Given the standard of review by which I am bound, I find plaintiff's argument unpersuasive. The arguments that plaintiff seeks to preclude all tend to refute the assertion that defendant's decision to substitute its cost accounting method for plaintiff's was arbitrary, capricious, an abuse of discretion, or contrary to law. The fact that the Secretary did not explicitly state her reliance on these arguments does not defeat their relevance.

Moreover, as to the two arguments relied on in this opinion—the need for averaging and plaintiff's failure to use more precise accounting methods for all of its non-revenue producing costs—there is reference to this concern in the Secretary's opinion:

Ordinarily, a cost center as defined in the Provider Reimbursement Manual (HIM–15), § 2302.8, includes all of the costs of a specific function. Here all that has been developed are the salaries. The Provider did not include space, telephone, or other costs which are involved in the function of the information desk, nor were any overhead costs attributed to this function. These facts do not support the Board's conclusion that the information desk salaries should be broken out as a cost center and allocated separately on the basis of patient days to the routine areas.

Tr. at 10. Therefore, even if plaintiff's citation to the *Yeshiva* opinion has some bearing on this case, it would not preclude the arguments that I have found sustain the decision of the Secretary.

ment. For accounting periods beginning on or after September 1, 1976, the Secretary has required that patients in ancillary areas at the midnight census-taking hour be counted for purposes of calculating the cost per diem for general routine in-patient care. Reimbursement for ancillary costs, however, is calculated independently based upon the utilization that Medicare patients make of each separate area. Manual Section 2345. The seeming inconsistency of including patients receiving ancillary care in the calculation of routine costs is based on the assumption that in-patients receiving services in ancillary areas when the patient census is taken at midnight would almost certainly move to a routine bed within the following twenty-four hours.[6]

The reasons for plaintiff's opposition to this reimbursement policy becomes apparent from a closer look at the policy's practical implications. The Secretary calculates the per diem costs of the routine services by dividing the total routine costs by the total number of in-patient days and then multiplying the quotient by the number of medicare in-patient days. 42 C.F.R. § 452(d)(7). Since few medicare recipients use the labor/delivery room facilities, inclusion of the time spent by patients at these areas as in-patient days serves substantially to reduce the per diem cost reimbursement figure without substantially increasing the number of in-patient days for which the per diem reimbursement will be applied.

In support of its decision to exclude labor/delivery room days from the calculation of reimbursements for routine in-patient care, plaintiff cites two circuit court opinions that have overruled decisions by the Secretary to implement its policy requiring inclusion of labor/delivery room days. The first is *St. Mary of Nazareth Hospital Center v. Schweiker*, 718 F.2d 459 (D.C.Cir.1983), in which the D.C. Circuit, following a thorough analysis of all the arguments put forth by the Secretary, reversed the Secretary's decision to include labor/delivery days in calculating routine services costs. The administrative record in the *St. Mary* case has been incorporated here for purposes of economy, and by agreement of the parties. Rec. at 532, 826. The second opinion is *International Philanthropic Hospital Foundation v. Heckler*, 724 F.2d 1368 (9th Cir.1984), in which the Ninth Circuit adopted in full the views expressed in *St. Mary, supra*, without further discussion. The focus of my opinion will, therefore, be on a review of the arguments put forth in *St. Mary, supra*.

As a preliminary matter, the court in *St. Mary* determined that there was little reason to defer to the expertise of the Secretary on the question of labor/delivery room costs, since the principles underlying the Secretary's decision were "general, were not developed in light of any special information about either labor/delivery room care or accounting practices, and there is nothing that went into the development of the policy in Manual § 2345 that requires expertise for one to understand." 718 F.2d at 466. In this regard, the court noted that before 1979, the statements of the Social Security Administration tended, if anything, to favor the position of the provider, and that the development of the Secretary's present policy was not based on any specific findings or revelations that would

---

**6.** The term "inpatient" is defined in HIM–15, Part I, § 2202.1 (CCH Medicare and Medicaid Guide, ¶ 6043) as follows:

An inpatient is a person who has been admitted to a hospital ... for bed occupancy to receive inpatient hospital ... services. A person is considered an inpatient if he [or she] is formally admitted as an inpatient with the expectation that he will remain overnight and occupy a bed even though it later develops that he can be discharged, or is transferred to another hospital and does not actually use a hospital bed overnight.

The "day of admission" is defined as the day when a person is admitted to a hospital or skilled nursing facility for bed occupancy for purposes of receiving inpatient hospital or skilled nursing services and counts as one inpatient day. If admission and discharge or death occur on the same day, the day is considered a day of admission and counts as one inpatient day.

HIM–15, Part I, § 2205.1 (CCH Medicare and Medicaid Guide ¶ 6191A).

favor a change of position. *Id.* at 464–66. The court concluded that "neither consistency nor timing nor expertise weigh[ed] heavily in favor of deferring to HHS in this matter." *Id.* at 466.

With this consideration in mind, the court outlined the various bases for the Secretary's policy, as follows:

(1) the definition of in-patient day in the regulations is broad, and no reason appears to exclude labor/delivery room patients from that category;

(2) many providers, including some involved in this appeal, actually charge their labor/delivery room patients for a day of routine care even if the patient has not left the labor/delivery area;

(3) routine care at all times is available to the labor/delivery area patients;

(4) these patients were moved to routine areas and standby costs should therefore be attributed to them;

(5) any disparity between costs and reimbursement is a result of averaging, which is a basic and judicially accepted component of the medicare reimbursement scheme;

(6) this accounting of labor/delivery patients is consistent with accounting for patients in other ancillary care areas.

*Id.* at 466. In addition, the court pointed out that those hospitals that counted labor/delivery room patients as routine patients had entirely different methods of reimbursement, under which routine and ancillary costs are not segregated. *Id.* at 469.

As to Point (1), the court found that the precise definition of in-patient days as it related to the question of labor/delivery days was ambiguous, but that the hospital's interpretation was clearly more rational than the Secretary's, since there was "no logic in apportioning to patients costs they have not incurred while refusing to include in the apportionment costs they have generated." *Id.* at 468. The court recognized, however, that if any of the other bases supplied by the hospital were deemed rational, the Secretary's interpretation of the

definition of in-patient days should be upheld, for it would not be "contrary to law."

The Government's second argument—that other hospitals count labor/delivery room patients in the hospital's in-patient count was found by the court to be "largely irrelevant," since a finding "[t]hat a hospital counts a labor/delivery room patient as an in-patient for some purposes does not tell whether . . . the patient has generated routine costs." *Id.* at 468.

The third and fourth justifications were refuted by the court for the following reasons: first, if labor/delivery room patients were not counted as in-patients at the midnight census hour, there would be no distortion in the reimbursement for routine care, since, under the hospital's proposed accounting method, a day of routine care would still be counted as soon as a labor/delivery patient was transferred to a routine care bed; second, it is factually untrue that all labor/delivery patients transfer to routine beds; third, in the analogous situation of patients temporarily released from treatment, the patient is not counted as a routine in-patient, even though a room is reserved for him; and fourth, there is no greater justification for apportioning standby costs to labor/delivery area patients than to leave-of-absence patients, yet the latter are not counted as routine in-patients, and their routine costs are not attributed to them. *Id.* at 469–70.

In disputing the Government's claim that its cost policies reflected an averaging of various inaccuracies, the court used three approaches. First, it compared the inaccuracies created by a patient using ten minutes of routine services with a labor/delivery room patient when both happen to be counted at the midnight census. It found, first, that unlike a patient receiving only ten minutes of routine care—who is counted both for purposes of in-patient days and in-patient costs—the labor/delivery room patient is added to the in-patient count but not included in the calculation of the average per diem cost; and second, that unlike the routine patient who has received at least *some* routine care before routine

costs are apportioned to him as a routine patient, "[t]he labor/delivery room patient has received none before she is counted as an in-patient." *Id.* at 472.

The court's second approach was to compare labor/delivery room areas with the other ancillary areas in terms of their impact on costs. The court found the following distinctions to be significant: (1) that a much higher percentage of labor/delivery patients will be under care at the census-taking hour than is true for patients in other ancillary areas; (2) medicare patients are much more proportionately represented in other ancillary services than for labor/delivery room areas. *Id.* at 472.

As a third approach, the court pointed to other cost elements not included in the calculation of average routine cost per diem, such as bad debt or malpractice insurance costs. Just as these costs are apportioned directly to their source—as either medicare or non-medicare costs—rather than averaged across the entire patient population, so too, the costs of the labor/delivery room could be removed from the averaging system and apportioned directly, according to the court. *Id.* at 473.

The Government's final argument against excepting the labor/delivery area patients from the accounting treatment accorded other ancillary patients was based inferentially on 42 C.F.R. § 405.452(d)(7), which excepts from in-patient count new born in-patients *only* in special care units. The court did not agree that this section prevented a hospital from excepting other areas, such as the labor/delivery room areas if appropriate. Since, for reasons already stated, the court found the Government's method of apportioning labor/delivery costs to be irrational, the court deemed this to be an appropriate opportunity for creating another exception. *Id.* at 473–74. Rather than reverse the Secretary, the court ordered the case remanded to the "PRRB" for the limited purpose of taking evidence on the issue of whether the use of other ancillary services by medicare beneficiaries at the census-taking hour suffices to compensate for the dilution of medicare

reimbursement costs by including labor/delivery area patients in the calculation of average general routine costs per diem. Absent such a finding, the Secretary was directed to exclude from the in-patient count labor/delivery room patients not previously receiving routine services. *Id.* at 474.

After a careful review of the opinion in *St. Mary*, I have determined that, for three essential reasons, the holding in that case ought not to be followed here. First, I find that, in light of the United States Supreme Court's recent pronouncements in *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, —— U.S. ——, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the D.C. Circuit attached too much significance to the Secretary's change in policy regarding the definition of "in-patient days." In *Chevron*, the Supreme Court upheld the Environmental Protection Agency's ("EPA") definition of the term "stationary source" of air pollution as it appears in the Clean Air Act Amendments of 1977, Pub.L. 95–95, 91 Stat. 685. In response to the argument that the EPA's interpretation is not entitled to deference because it represents a break with prior interpretations of the statute, the Court observed that "[a]n initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informal rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." *Id.* —— U.S. at ——, 104 S.Ct. at 2791. Similarly, in this case, the Secretary should not be precluded from changing its method for calculating in-patient days. As the agency responsible for administering the medicare statute, H.H.S. is still entitled to considerable deference by the reviewing court.

Secondly, the case is distinguishable on the basis of the circuit court's factual findings. For example, in dispelling the Secretary's assumption that labor room patients ultimately receive routine care, the court cited evidence in the record that anywhere from five to forty percent of all labor/delivery patients are discharged from the hospi-

tal altogether, rather than to a routine area, due to false labor or some other cause. *St. Mary, supra,* 718 F.2d at 470. These figures were based, however, on records obtained from only two of the sixty-six hospitals involved in the *St. Mary* case. Therefore, even though the record in the *St. Mary* case is controlling here [7], *see supra* p. 334, that record cannot be said to fully support the circuit court opinion in that case.

 Finally, I find that the scrutiny with which the Court of Appeals for the District of Columbia Circuit reviewed the Secretary's averaging argument was not consistent with the requirements of the A.P.A. set forth above. The task of this Court is not to determine whether the accounting method employed by the Secretary is superior or more accurate than the method proposed by the provider, but rather, whether it is arbitrary, capricious, or contrary to law. I find that the Secretary's argument regarding the need for averaging various costs satisfied this standard of review. Two types of inaccuracies are balanced under the Secretary's plan. First, the counting of in-patient days at the midnight census balances the inaccuracies created by patients admitted shortly before midnight and discharged shortly thereafter—and who count as in-patient days even though receiving little care—with the inaccuracies created by patients admitted early in the morning and discharged before midnight—who will not count as routine in-patient days at all. Secondly, the inclusion of *all* auxiliary patients for purposes of calculating in-patient days balances the inaccuracies created by auxiliary facilities catering to a high percentage of medicare patients with the inaccuracies created by the labor/delivery room, which admittedly has a proportionately low level of medicare patients. The fact that one inaccuracy is not completely balanced by another, that one inaccuracy is more apparent on its face than another, or that the Provider's proposed method may prove more accurate in this instance, does not prove that the Secretary's plan is arbitrary, capricious, or in any other way subject to reversal by this Court.

In departing from the position adopted by the Court of Appeals for the District of Columbia Circuit, I join with the District Court for the District of Massachusetts in *Beth Israel Hospital v. Heckler,* 597 F.Supp. 3 (D.Mass.1983). After upholding the Secretary's policy of counting labor/delivery room days as in-patient days for routine cost appraisal, 572 F.Supp. 573 (D.Mass.1983), the court in *Beth Israel* declined to reconsider its ruling in light of the *St. Mary* opinion. The court reasoned in part that

"although Section 2345 is at best a system of rough averaging, it is not, as this Court's earlier decision stated, arbitrary or irrational, nor does it shift impermissibly the cost of treating medicare patients to non-medicare patients. The Secretary's rule is perhaps not the best solu-

---

7. The parties' stipulation to incorporate the *St. Mary* record is relevant in regard to another argument put forth by defendant. In its attempt to distinguish *St. Mary,* defendant points out that in *St. Mary* the court stated that the parties "appear to have stipulated" that the appeal would challenge only the counting of patients who have not previously occupied a routine bed. 718 F.2d at 462 n. 6. The court then found the labor/delivery room to be unique in that none of these patients received any prior routine care and relied on this argument in support of its holding that labor delivery patients should be counted differently than patients in other ancillary areas. *Id.* at 472.

The defendant in this case contends that here, unlike in *St. Mary,* some of the patients admitted to the labor/delivery room have already been admitted to the hospital in the later stages of pregnancy due to complications such as toxemia or high blood pressure. Def. Memorandum, at p. 43. Therefore, defendant argues, the labor/delivery room is not substantially different from other ancillary areas in which some, but not all, patients are admitted without already having received routine services.

In response, plaintiff contends that defendant is precluded from raising this argument since, by incorporating the record in *St. Mary,* the parties have incorporated the stipulation as well. Based on the evidence before me, I find it difficult to discuss the intentions of the parties in this regard. Nevertheless, in distinguishing this case from *St. Mary,* I have not relied on this argument.

338

tion to the problem, nor is it necessarily the solution this Court would choose, but that is not the test."

*Id.*, slip op. at 3–4, citing *Thongsamouth v. Schweiker*, 711 F.2d 465, 469 (1st Cir. 1983).[8] Because I find that the approach taken by the court in *Beth Israel* is consistent with the standard of review called for by the A.P.A., I concur in its holding and affirm the adjustment of the Secretary.

SO ORDERED.

---

**8.** The decision was also based on the Court's finding that *St. Mary* was distinguishable in that it "challenged § 2345 only as it applied to women who were admitted directly to the labor/delivery area and the parties stipulated that the class of patients residing in the labor/delivery area at the census-taking hour have received "no routine care." *Beth Israel*, at 4–5. In *Beth Israel*, the parties entered into no such stipulation. As indicated *supra* n. 7, it appears that in this case the parties may have incorporated the stipulation in *St. Mary*. If that is the case, the distinction raised in *Beth Israel* would be inapplicable here.