ABBOTT–NORTHWESTERN
HOSPITAL, INC., et al.,
Plaintiffs-Appellees,

v.

Richard S. SCHWEIKER, Secretary of
Health and Human Services,
Defendant-Appellant.

No. 82–1029.

United States Court of Appeals,
Eighth Circuit.

Argued June 16, 1982.

Decided Jan. 12, 1983.

Thorwald H. Anderson, Jr., U.S. Atty., Minneapolis, Minn., J. Paul McGrath, Asst. Atty. Gen., Anthony J. Steinmeyer and Carlene v. McIntyre, Civ.Div., Dept. of Justice, Washington, D.C., for defendant-appellant.

Hubert V. Forcier, Jerry W. Snider, James L. Volling, Minneapolis, Minn., for plaintiffs-appellees; Faegre & Benson, Minneapolis, Minn., of counsel.

Before LAY, Chief Judge, BRIGHT, Circuit Judge, and FAIRCHILD,* Senior Circuit Judge.

* Of the United States Court of Appeals for the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d).

1. The Health Insurance for the Aged Act, 42 U.S.C. §§ 1395–1395vv, established a program of federally funded health insurance for the aged and disabled commonly known as Medicare. Part A of the Medicare program provides for the payment of inpatient hospital and related post-hospital benefits for persons age 65 and over. Under Part A, a certified "provider of

FAIRCHILD, Senior Circuit Judge.

This appeal concerns the treatment, in the course of a retroactive adjustment, of interest earned on over-payments of social security taxes by providers of health services under the Medicare Act. The Secretary of Health and Human Services required that any interest received by the providers and attributable to Medicare payments be offset against the interest expense claimed by the providers under the Act. On appeal the district court concluded that such an offset was a violation of the Secretary's own regulations concerning Medicare reimbursements. We reverse for the reasons stated below.

I.

*A. The Refund*

The facts giving rise to the interest award and the current dispute may be summarized as follows. Each of the plaintiff hospitals was formed by consolidating two or more constituent hospital corporations in 1969 or 1970. These predecessor hospitals had all waived their exemption from coverage under the Federal Insurance Contribution Act (FICA) as non-profit charitable institutions. Accordingly, they made FICA tax payments on wages paid. *See* 26 U.S.C. §§ 501(c)(3), 3121(b)(8)(B). Following the consolidations the newly formed hospitals continued to make regular Social Security payments on the assumption that they had assumed their predecessor's tax status. As providers of services under Part A of the Medicare Act,[1] the hospitals were reimbursed monthly by a fiscal intermediary of the Department of Health and Human Services for that portion of the post-consolidation FICA payments attributable to Medicare patients.[2]

services" is directly reimbursed for the "reasonable costs" of covered services to Medicare beneficiaries. 42 U.S.C. §§ 1395d, 1395x(u). The appellee hospitals became eligible for federal reimbursement as Medicare providers by filing an agreement with the Secretary of Health and Human Services. 42 U.S.C. § 1395cc.

2. Medicare providers are commonly reimbursed for their services by private organizations acting as fiscal intermediaries pursuant to

The intermediary's payments would typically be the last act in a routine Medicare reimbursement—except for an end-of-the-year cost adjustment—but a complication arose. The Internal Revenue Service informed the providers in 1972 or 1973 that they had not automatically acceded to their predecessors' FICA tax status and that their post-consolidation Social Security payments were therefore subject to refund with interest.[3] The providers retroactively waived this exemption, but under IRS regulations each employee was extended the option of adopting Social Security coverage for this period or receiving a refund of the taxes withheld on their behalf. A number of employees exercised the latter option. For each employee requesting a refund the hospital was reimbursed with interest the employer's share of the previously paid tax.[4]

### B. Administrative Proceedings

In the course of its annual review of the provider's costs in 1976 and 1977 the Secretary's fiscal intermediary examined the status of these reimbursements.[5] In its Notice of Program Reimbursement to each of the plaintiffs the intermediary determined that (1) the portion of refunded FICA taxes previously reimbursed to the providers by the Medicare program must be offset against the providers' reimbursable costs in the year the refund was received and (2) the interest earned on the Medicare portion of the refund constitutes "investment income" which must be offset against the providers' reimbursable interest expense. 42 C.F.R. § 405.419(b)(2)(iii).

The providers challenged the intermediary's determination before the Provider Reimbursement Review Board (PRRB). *See* 42 U.S.C. § 139500(a); 42 C.F.R. § 405.-1835. After a hearing in March of 1977, the PRRB issued its decision[6] affirming the substance of the intermediary's notice to the providers. First, the Board agreed that the refund of FICA taxes should offset the providers' reimbursable costs in the year received, though it modified the intermediary's cost adjustment to reflect actual Medicare use in the year the taxes were paid.[7] Second, the Board agreed that inter-

contract with the Secretary. 42 U.S.C. § 1395h. The fiscal intermediary makes interim payments to a provider on a monthly basis. 42 U.S.C. § 405.454(e).

3. In 1976 the Internal Revenue Code was amended to provide that any exempt organization paying Social Security taxes for three calendar quarters is deemed to have waived its exemption. 26 U.S.C. § 3121(k)(4). The parties agree the circumstances giving rise to this litigation could not recur under this new provision.

4. Three appellee hospitals (Metropolitan Medical Center, Inc., Abbott-Northwestern Hospitals, Inc., and Immanuel-St. Joseph's Hospital of Mankato, Inc.) also received interest on Social Security payments made on behalf of employees who decided not to elect the refund option, though the principal was retained by the IRS. The parties appear to have agreed throughout this litigation that the interest earned on refunded or retained principal is indistinguishable for purposes of their treatment under the Secretary's regulations, and is so treated on this appeal.

5. At the end of the providers' fiscal year a "cost report" is filed with the intermediary. 42 C.F.R. § 405.406(b). The intermediary is required to analyze the report and undertake any necessary audit of the reimbursements claimed. After comparing the reported costs with the interim payments, the intermediary announces its final determination of Medicare reimbursements due the provider in a "Notice of Program Reimbursement." 42 C.F.R. § 405.1803.

6. The Board actually issued a separate decision for each of the hospitals. Any dissimilarity in the decisions has no bearing on this appeal; they are therefore referred to as though one opinion for ease in writing.

7. The providers never disputed that the refund itself must be offset against Medicare reimbursements, but before the PRRB they did argue that the offset should be against costs in the year the original expense was incurred. In calculating the portion of the FICA tax refund attributable to Medicare use, the intermediary had multiplied the refund by the percentage of Medicare utilization in the year received. The PRRB sought a compromise between the two approaches by adjusting the refund by the Medicare utilization rate in the year the tax was paid; this adjustment limited the offset against present costs to an amount approximating that actually paid by Medicare. The providers do not challenge the PRRB's treatment of the underlying refund in this appeal.

est earned on the refunded taxes should reduce the providers' interest expense claim.

The PRRB affirmed this second ruling while acknowledging that the intermediary was mistaken in characterizing the FICA interest as "investment income" subject to offset under 42 C.F.R. § 405.419(b)(2)(iii). The Board held the interest on FICA taxes was neither specifically included nor "specifically excluded from the offset requirement" in § 405.419. PRRB Dec. at 13. Concluding that the Medicare regulations were silent on the treatment of the interest, the PRRB held that the interest offset was consistent with the Medicare program's statutory policy of paying only for a provider's net costs. 42 U.S.C. § 1395x(v)(1)(A). Since the interest income reduced the provider's costs the Board decided an offset against interest expense was appropriate. The Board stressed that the interest was "wind-fall" income on monies provided by the Medicare program and therefore equity required that it be offset against any amount owed the providers.

The Secretary of Health and Human Services declined to modify or reverse the PRRB's ruling within 60 days; it therefore constitutes the agency's final decision. 42 U.S.C. § 1395oo (f)(1).

### C. Judicial Proceedings

The providers sought review of the PRRB's decision in federal district court. *See* 5 U.S.C. § 701; 42 U.S.C. § 1395oo (f)(1). On appeal the hospitals acknowledged the propriety of offsetting the FICA tax refund against reimbursable costs in the year received, but challenged the Board's affirmance of the interest offset.[8] The district court designated a United States Magistrate to conduct hearings and submit proposed findings of fact and recommendations for disposition of the case. 28 U.S.C. § 636(b)(1)(B). After considering cross-motions for summary judgment, the Magistrate recommended that the plaintiffs' motion be granted.

The Magistrate concluded that the Board's affirmance of the interest offset was contrary to Medicare regulations. Specifically the Magistrate pointed to § 405.-419(a) which provides that "necessary and proper interest on both current and capital indebtedness is an allowable cost." 42 C.F.R. § 405.419(a). Noting that § 405.419 expressly requires the reduction of interest expense by investment income, 42 C.F.R. § 405(b)(2)(iii), the Magistrate reasoned that no other interest income may reduce a provider's interest expense. The interest offset also struck the Magistrate as contrary to the Medicare regulation on provider reimbursements, 42 C.F.R. § 405.454(1), which he asserted contemplates that no interest be charged on the over- or under-payment of Medicare costs. *Cf.* Reimbursement Manual, Part I § 2409. The Magistrate emphasized that his recommendation to grant the plaintiffs' motion for summary judgment was based on the view that the regulations were part of the contractual arrangement between the parties alterable only by formal rule-making procedures, and even then to be accorded only prospective effect.

The district court adopted the recommendations of the Magistrate. The court stated that the accepted rules of statutory construction require that § 405.419 be read to preclude the offset of interest expense by other than investment income. The court also noted that the underlying purpose of the investment income offset—to reduce a provider's incentive to divert Medicare funds from operational costs to investment opportunities—had no bearing on the treatment of the FICA interest earned on a good faith over-payment. Finally, the court agreed that an interest offset was inconsistent with "the clear statutory policy of not requiring interest payments on either over- or under-payments of Medicare funds."

---

**8.** At issue before the district court was that portion of interest earned on the FICA refund attributable to Medicare utilization actually offset against the plaintiff hospitals' reimbursable interest expense—approximately $146,127.00. The proper treatment of this sum remains the only issue in this appeal.

District Court Opinion at 4. The court entered an order granting the plaintiffs' motion for summary judgment on November 3, 1981. The Secretary appeals from judgment accordingly entered.

## II.

■ An administrative agency's interpretation of its own regulation merits considerable respect by a reviewing court, and will be controlling absent a showing "that it is plainly erroneous or inconsistent with the regulation." *Cheshire Hosp. v. N.H.–VT. Hosp. Service,* 689 F.2d 1112, 1117 (1st Cir. 1982); *Medical Center of Independence v. Harris,* 628 F.2d 1113, 1117 (8th Cir.1980). *See also* 1A Sutherland Statutory Construction § 31.06, at 362 (4th ed. 1973). Such deference is especially applicable to areas like Medicare reimbursements that require judgments about appropriate cost accounting practices. *Cheshire Hosp.,* 689 F.2d at 1117 (citing *Hospital San Jorge v. Secretary of Health, Ed.,* 616 F.2d 580, 589 (1st Cir. 1980) (Campbell, J. concurring). *Cf. Bright v. Ball Memorial Hospital Ass'n, Inc.,* 616 F.2d 328, 33 n. 1 (7th Cir.1980); 1A Sutherland Statutory Construction § 31.06, at 362 n. 6 (Supp.1982).

The district court acknowledged the substantial deference due the Board's conclusion that its enabling statute and regulations warranted the interest income offset, but held the Board's determination to be inconsistent with the language and policy of Medicare regulations. The disposition of this appeal turns on the same issue: is the reduction of the providers' interest expense by the interest income earned on the FICA refund inconsistent with the terms or the underlying policy of the Medicare regulations.

The Secretary asserts that the regulations are simply silent as to the treatment of interest refunded in circumstances not a part of the ordinary course of business; and that, in such a case, the PRRB properly relied upon the basic principle that a Medicare provider should be reimbursed only its reasonable costs. 42 U.S.C. § 1395x(v)(1) (A). The plaintiffs argue, however, that the offset is inconsistent both with regard to

the specific terms of 42 C.F.R. § 405.419 and with the underlying policies of provider reimbursement regulations generally. We examine each of the plaintiffs' contentions in turn.

*A.*

■ The principal section relied on by the plaintiffs to establish a regulatory limit on the Board's power to offset the refunded interest is 42 C.F.R. § 405.419. Section 405.419 provides in relevant part:

§ 405.419 Interest expense.

(a) *Principle. Necessary and proper* interest on both current and capital indebtedness is an allowable cost. . . .

(b) *Definitions*

. . . .

(2) *Necessary.* Necessary requires that the interest:

(i) Be incurred on a loan made to satisfy a financial need of the provider. Loans which result in excess funds or investments would not be considered necessary.

(ii) Be incurred on a loan made for purpose reasonably related to patient care.

(iii) Be reduced by investment income except where such income is from gifts and grants, whether restricted or unrestricted, and which are held separate and not commingled with other funds. Income from funded depreciation or provider's qualified pension fund is not used to reduce interest expense. Interest received as a result of judicial review by a Federal court (as described in § 405.-454(1)) is not used to reduce interest expense.

(Emphasis in original.)

Section 405.419 expressly requires that a provider's interest expense be offset by a single form of interest income: investment income. Therefore, providers argue, the plain meaning of § 450.419 and application of the statutory maxim *expressio unius est exclusio alterius* indicate that investment income is the *only* type of interest income for which an offset is permitted.

Even ignoring the substantial deference due the Secretary's own interpretation of its regulation, we are uncomfortable with the providers' construction of § 405.419. Their suggestion that a conclusive interpretation of the section can be obtained by examining its "plain meaning" does not quiet our discomfort. The plain meaning approach to statutory construction "uses as its guide the language of the statute when read in context." R. Dickerson, *The Interpretation and Application of Statutes* 190 (1975). The express language of § 405.419 does not indicate that interest income is subject to only one form of offset. The first sentence of § 405.419(b)(2)(iii), which plaintiffs rely upon here, states that interest expense will not be deemed "necessary" unless reduced by investment income; it does not expressly state that this is the single allowable offset.

Nor is the language of this express offset any more restrictive when viewed in the context of the section as a whole. Section 405.419 merely advances a Medicare accounting principle: a provider is allowed to claim all necessary and proper interest expense incurred on current and capital indebtedness. The remainder of the regulation is devoted to giving some substance to this principle. For example, the second sentence of § 405.419(b)(2)(iii) provides that income from a provider's funded depreciation or pension fund does not reduce interest expense. As with the first sentence, the express terms of this proviso do not exclude the possibility of other excepted income. Certainly the plaintiffs would not have us read this sentence to mean that income from all other sources must be offset against interest expense—since this would

include the interest earned on the FICA tax refund. Viewed in context, the regulation's references to specific forms of includable and excludable interest income suggest the general contours of a relatively undefined accounting principle, rather than delineate its precise limits.

The providers' invocation of the Latin maxim *expressio unius est exclusio alterius* is equally unhelpful. The reliability of this maxim as a tool for statutory interpretation is open to question. *See* R. Dickerson, *supra,* at 234 ("it is simply not true, generally, that the mere express conferral of a right or privilege in one kind of situation implies the denial of the equivalent right or privilege in other kinds"). Whatever its general value, its specific application "is premised on the assumption that the legislature considered and rejected all factors not listed." *Tri-State Terminals, Inc. v. Jesse,* 596 F.2d 752, 755 n. 2 (7th Cir.1979). The maxim therefore requires that we return to the context of the regulation and the circumstances of our particular case to determine the validity of this presumption. R. Dickerson, *supra,* at 234–35. Having already observed that § 405.419 was probably not drafted with exhaustiveness in mind, and noting that the exceptional facts of this appeal were not likely to be anticipated in any event, we again conclude that the regulation need not be read to preclude other forms of interest income offsets.

The plaintiffs' application of the rules of statutory construction to § 405.419 fail to persuade us that the regulation must be read as permitting but one form of interest income offset against a provider's interest expense.[9] At best, their treatment sug-

---

**9.** The providers' brief makes allusions to a number of other canons of statutory construction we find unpersuasive in our context. First, they assert that the doctrine of *ejusdem generis* requires that an agency follow a specific statutory provision over a more general one. Although this maxim (literally meaning of the same kind, class, or nature) is applied to a phrase in which a catch-all item might be understood by reference to preceding, more specific terms, *see* R. Dickerson, *supra,* at 109 n.18, 234, W. Hurst, *Statutes In Court* 182 (1970), the principle that a specific provision

prevails over a general provision is not without some basis. *See, e.g., F.T.C. v. Manager, Retail Credit Co., Miami Br. Off.,* 515 F.2d 988, 993 (D.C.Cir.1975). In applying the principle to § 405.419 the providers beg the question, however: they assume the regulation prohibits an offset. Having decided that § 405.419 need not be so construed, we conclude that the section can be read in harmony with the other medicare statutes; one need not take precedence over the other. Second, the providers argue that construing § 405.419 as allowing interest expense offsets for interest income not express-

gests that the section's applicability to the interest earned on the FICA refund is unclear. This of course is the interpretation urged by the Secretary. "Since this interpretation is not plainly inconsistent with the wording of the regulations, we accept the Government's reading of those regulations as correct." *United States v. Larionoff,* 431 U.S. 864, 872–73, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977).

*B.*

While we are satisfied that no Medicare regulation expressly prohibits the FICA interest offset, our inquiry is not at an end. There remains a question as to whether the Secretary's treatment of the FICA interest is consistent with the policies inherent in its enabling statute and promulgated regulations.

■ There is no question that an agency is authorized to carry out its statutory duty through the adjudication of an individual dispute even in the absence of specific regulations. *Matter of Keokuk Steel Castings,* 638 F.2d 42, 44–45 (8th Cir.1981); *Cf.* 2 K. Davis, Administrative Law Treatise § 7:27, at 148–49 (1979). In this case the Secretary is statutorily charged with the broad duty of providing medical care to those eligible under the Medicare Act, including paying private providers their reasonable costs. 42 U.S.C. § 1395f(b)(1). This duty necessarily requires the Secretary to decide which of the provider's costs are reasonable.

Nevertheless, PRRB's *ad hoc* resolution of the current dispute was bound by the underlying policies of its governing statute and its own regulations. *Doraiswamy v. Secretary of Labor,* 555 F.2d 832, 843 (D.C. Cir.1976). *Cf.* 2 K. Davis, *Administrative Law Treatise* § 7:27, at 151–52 (1979) (absent a reasoned explanation for departure, agency's *ad hoc* decision must be consistent with past policy). The Secretary persuasively argues that its interest income offset was in keeping with the precept underlying 42 U.S.C. § 1395x(v)(1)(A). That statute states in relevant part:

> The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items be included, in determining such costs....

This statute constrains the Secretary to reimburse a provider for only those costs actually incurred in providing services. The Secretary argues that since the interest refunded along with the FICA taxes was earned on monies originally paid by the Medicare program, it must be applied to reduce the costs of providing services to Medicare patients.

Absent any conflicting statutory or regulatory purposes, the Secretary's conclusion does not strike us as arbitrary, capricious or in excess of statutory jurisdiction. *See Medical Center of Independence v. Harris,* 628 F.2d 1113, 1117 (8th Cir.1980). The providers argue, however, that the policies underlying two Medicare regulations run contrary to the Secretary's interpretation and require disallowance of the offset.

(1) 42 C.F.R. § 405.419(b)(2)(iii)

Independent of the question of whether 42 C.F.R. § 405.419 by its terms precludes the offset of a provider's interest expense by other than investment income, the plaintiffs argue that other reductions in interest expense must be consistent with the policies which gave rise to the regulation's express offset in subsection 405.419(b)(2)(iii). As an initial matter, we are uncertain why another offset could not be justified on different policy grounds from those advanced to justify an investment income reduction; we need not address this issue, however, since we are confident that the FICA interest reduction is consistent with the policies giving rise to the investment income offset.

---

ly referred to in its text renders the regulation's specific reference to investment income superfluous. We reject this notion. The regulation serves to make clear that investment income is

properly offset. The agency cannot be faulted for failing to provide expressly for every other contingency.

The plaintiffs assert in their brief that the interest income offset was promulgated for the single purpose of discouraging the diversion of Medicare funds to income producing activities unrelated to patient care. Since neither party asserts that such a diversion occurred here, they would argue that the purpose of the regulation would not be furthered by allowing any additional offsets.

■ This argument was recently rejected by the First Circuit. *Cheshire Hosp. v. N.H.–VT. Hosp. Service,* 689 F.2d 1112 (1st Cir.1982). In *Cheshire* a Medicare provider sought review of the PRRB's determination that interest income earned on a Debt Service Reserve Fund (DSRF) was investment income within the meaning of § 405.-419(b)(2)(iii). The Secretary contended that "the purpose of the offset rule is not just to deter excess borrowing. . . . [T]he offset rule serves the additional purpose of insuring that providers are reimbursed only for those costs which they actually incur, and application of the offset rule to *Cheshire*'s DSRF is fully consistent with this second purpose of the regulation." 689 F.2d at 1119. The First Circuit found the Secretary's argument wholly consistent with the general purposes of the Medicare Act. Citing 42 U.S.C. § 1395x(v)(1)(A), the court concluded that "[s]uch a determination clearly serves the purpose of the Medicare Act which limits reimbursement to

costs actually incurred by the provider." *Id.* Since the FICA interest reduction serves the same purpose, we think it, too, is consistent with the policies underlying the investment income offset and the Act generally.[10]

### (2) 42 C.F.R. § 405.454(f)(3)

■ Under the Medicare Act, the fiscal intermediary advances a provider funds periodically to cover its estimated expenses. The intermediary makes retroactive adjustments of these payments at the end of a provider's fiscal year to reflect actual costs. *See United States v. Gravette Manor Homes,* 642 F.2d 231, 233 (8th Cir.1981); notes 2, 5 *supra.* The calculation of these over- or under-payments is made according to 42 C.F.R. § 405.454(f)(3). That regulation expressly requires that the provider return the amount of the over-payment, but makes no provision for the payment of the time value of the money; the regulation similarly requires the Government to pay for any under-payment, without reference to interest. Both parties agree that it had become the custom under § 405.454(f)(3) not to charge interest on retroactive adjustments made by the fiscal intermediary at the end of each fiscal year.[11] The providers argue that requiring them to pay interest on their over-payment of FICA taxes was inconsistent with this longstanding practice.[12]

---

**10.** This is not to say that logic dictates the FICA interest refund be offset against the providers' current interest expense. On the contrary, it is not clear to us why the Secretary, in the face of regulatory silence on the issue, did not simply offset the FICA interest against the providers' total reimbursable costs in the year received as was done with the underlying principal; unless the analogy to investment income and the inertia of the fiscal intermediary's original determination that it was investment income seemed to compel that method of offset. Since either offset strikes us as consistent with statutory and regulatory policy, however, we defer to the Secretary's judgment.

**11.** Congress prospectively altered this custom in § 117 of the Tax Equity and Fiscal Responsibility Act of 1982, 42 U.S.C. § 1395g. Section 117 requires that interest accrue on the balance outstanding on any excess or deficit not paid within 30 days. Since this case was decided

while the practice of not imputing interest was still effective, we examine the Secretary's determination in light of the old practice.

**12.** While 42 C.F.R. § 405.435(f)(3) does not expressly preclude the charging of interest, the federal Magistrate implicitly found that the practice of not requiring interest payments had been incorporated into that regulation; the Magistrate concluded that § 405.435(f)(3) prohibits any interest charges on over-payments by its terms. The district court, and the plaintiffs here, only argue that the practice of not requiring interest payments calls into issue the consistency of the FICA interest offset with regulatory policy. The issue of when or to what extent an interpretive rule, guideline, policy statement or administrative practice is binding on an agency is not an easy one. K. Davis, Administrative Law Treatise § 7:21, at 98–105 (1979). We need not address whether § 405.-454(f)(3) expressly prohibits or by its policy

Whatever merit this policy may have had, it has no obvious application to this dispute. This was not a case where the Secretary charged a provider for the theoretical time value of the money received on an over-payment; this dispute is over interest actually received on monies paid by the Medicare program. The interest was earned because the use of the money was enjoyed by someone else, not the provider. This is also not a case where the error in over-payment was resolved in the few months before the next annual fiscal review, or that was likely to be partially offset by an under-payment of some other expense over the same period; the FICA refund was a one time error that took nearly three years to be discovered. While we concede that the agency's policy of ignoring the time value of money on short term under- or over-payments might have had some practical accounting advantage, we do not find the Secretary's departure from the practice in the case of a one time wind-fall to be arbitrary or capricious.

III.

The plaintiffs finally contend that we should hesitate to sustain the agency's retroactive determination of offset because a contractual relationship exists between the Secretary and a provider. We disagree. We have already concluded that the Secretary's determination—to offset the FICA interest against the provider's interest expense—was a reasonable result given the regulatory silence on the issue. The determination's retroactive effect strikes us as no more unsettling than a court's interpretation of an ambiguous clause in a contract.[13]

The FICA interest offset merely recoups to the Secretary income earned on Medicare payments and insures that the providers receive reimbursement for no more than their reasonable costs. By contrast the

plaintiffs here seek to benefit by a gap in the Secretary's regulatory scheme. The FICA refund and its accompanying interest was an unforeseen result of their own mistaken over-payment; the plaintiffs can hardly claim that they relied upon any right to retain this wind-fall. In fact, the plaintiffs concede that they never doubted their obligation to offset the refunded principal against their reimbursable costs.

Under these circumstances, the judgment of the district court, invalidating the offset of interest income earned on the FICA tax refund against the providers' interest expense, is reversed and the case remanded for the entry of judgment affirming the Secretary.

REVERSED AND REMANDED.

---

implications constricts the charging of interest on over-payments, ruling instead that past practice under the rule is inapplicable to the circumstances of this case in any event.

**13.** Cf. *Adams Nursing Home of Williamstown, Inc. v. Mathews,* 548 F.2d 1077, 1080–81 (1st

Cir.1977), where the court noted that "not every law that upsets expectations is invalid; courts have generally compared the public interest in the retroactive rule with the private interests that are overturned by it."