# United States Court of Appeals
### For the Eighth Circuit

_____

No. 11-3555

_____

Kindred Hospitals East, LLC, doing business as Kindred Hospital - Kansas City,
doing business as Kindred Hospital- St. Louis

*Plaintiff - Appellant*

v.

Kathleen Sebelius, Secretary of United States Department of Health and Human Services

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: June 14, 2012
Filed: September 12, 2012

_____

Before SMITH, BEAM, and SHEPHERD, Circuit Judges.

_____

BEAM, Circuit Judge.

Kindred Hospital - Kansas City and Kindred Hospital - St. Louis (collectively, "Kindred") appeal the district court's[1] order upholding the Department of Health and

_____

[1]The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

Human Services (DHHS) decision that Kindred should have reduced a state tax expense by the amounts it received from a privately administered pool fund on its Medicare Cost Reports for the years 2000–2003. We affirm.

## I. BACKGROUND

At issue in this case is Kindred's reimbursement for the Medicaid and Medicare services it provides. At the end of the fiscal year, a Medicare provider such as Kindred submits a Cost Report to its fiscal intermediary.[2] The Cost Report shows the costs incurred by the provider and the portion of those costs to be allocated to Medicare patients. The fiscal intermediary reviews the Cost Report, determines the total amount of Medicare reimbursement, and issues a Notice of Program Reimbursement. Reimbursement is generally based on the "reasonable cost" of the services. 42 U.S.C. § 1395f(b)(1). "Reasonable cost" is defined as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used." Id. § 1395x(v)(1)(A). The implementing regulations include as reasonable costs, "all necessary and proper costs incurred in furnishing the services, subject to principles relating to specific items of revenue and cost." 42 C.F.R. § 413.9(a).

Medicaid is an entitlement program which provides health and long-term care to low income individuals and families. Each state generally designs and administers its own Medicaid program and is reimbursed based on a financing formula from the

---

[2]Medicare is administered by the DHHS through The Centers for Medicare and Medicaid Services (CMS), and the CMS contracts out the payment and audit functions of the Medicare program to insurance companies which act as fiscal intermediaries. 42 U.S.C. §§ 1395h, 1395kk–1. Fiscal intermediaries determine payment amounts due to providers under Medicare law and interpretive guidelines published by CMS. Id. § 1395h; 42 C.F.R. §§ 413.20, 413.24.

federal government.  Under the Medicaid Act, the federal government provides "matching funds" referred to as Federal Financial Participation (FFP) for a state's Medicaid expenditures.  Before 1992, Missouri, along with several other states, generated funds for its Medicaid programs by using a "voluntary contribution" program.  Under this program, hospitals that accepted Medicaid payments "donated" some of those funds back to the state, and the state ultimately paid some of the funds back to the hospitals in the form of additional Medicaid reimbursement, including FFP funds.  This resulted in a situation wherein hospitals received Medicaid reimbursements in excess of their contributions. See Protestant Mem'l Med. Ctr., Inc. v. Maram, 471 F.3d 724, 726 (7th Cir. 2006) (describing the "loophole" in the Medicaid program that allowed states to gain extra federal matching funds without spending more state money).  In response to the many states with this system, Congress passed the Medicaid Voluntary Contribution and Provider-Specific Tax Amendments of 1991, 42 U.S.C. § 1396b(w).  The Amendments permitted the states to generate matching funds through a state tax on hospitals, but only if the tax was broad-based and uniform and only if it was not subject to a "hold harmless" provision under which the amount of taxes paid by a hospital would be a factor in determining the amount of state payments to the hospital.  Id. § 1396b(w)(1)(A).  Missouri instituted this tax on its hospitals, called the Federal Reimbursement Allowance (FRA) tax.  Mo. Rev. Stat. § 208.453.  The tax is based upon the hospitals' revenue, somewhat analogous to a sales tax, to help the state fund its portion of the Medicaid system.

Because the tax is imposed on all hospitals regardless of the type of patients each hospital treats, hospitals who treat a large number of Medicaid patients receive more federal reimbursement, while other hospitals are effectively punished by the FRA system for not having enough Medicaid patients.  This inequality led the hospitals in Missouri to initiate a pooling program at or around the same time the FRA tax system was imposed.  Under the pooling system, providers authorized the pool administrator, Management Service Corporation (MSC), to endorse and deposit

Medicaid reimbursement checks into separate bank accounts maintained by each hospital. MSC then transferred these funds to a pool account. According to the pool contracts, the pool funds were then distributed according to varying formulas. The MSC calculated pool payments by first calculating each provider's percent of contribution to the aggregate pool and then multiplying the percentage by the total amount of "losses" of the pool recipients.

There are two categories of Medicaid reimbursement. The first is known as per-diem reimbursement, and it is not included in the pooling arrangement. The second category of reimbursement consists of supplemental reimbursement payments based on the hospitals' Medicaid costs incurred in excess of the per diem, and also for the costs of treating the uninsured. These payments, called "add-on" payments, go into the pool. The MSC then uses a formula to determine whether a hospital was a "pool contributor" or a "pool recipient." If a hospital's Medicaid add-on payments exceeded the FRA tax it had paid and minor additional charges, the hospital paid into the pool (pool contributor). If the hospital's Medicaid add-on payments were less than its FRA tax payments and minor adjustments, the hospital received payments from the pool (pool recipient). A recap of MSC Accounting Reports showed that there is a strong correlation between the amount of pool compensation a hospital received and the amount by which its Medicaid add-on payments fell short of FRA tax withholdings.

For the years 2000-2003, Kindred was a pool recipient. On its Medicare Cost Reports for these fiscal years, Kindred claimed the FRA tax it paid as an allowable Medicare reimbursable expense.[3] On the other hand, Kindred recorded the pool

_____

[3]Missouri's FRA is a "health care related tax," see 42 U.S.C. § 1396b(w)(3)(A) for purposes of the Medicaid Act, but it is apparently undisputed that it is appropriate for hospitals such as Kindred to include such health care related taxes as allowable expenses for *Medicare* reimbursement. The closest regulation we can find for authority for this point describes capital-related reimbursable costs. 42 C.F.R. §

-4-

payments it received from MSC as Medicaid revenue. The issue in this case is whether the pool payments Kindred received should instead have been booked on the Medicare Cost Reports as a credit against the FRA tax payments it had earlier claimed as a reimbursable expense. If Kindred had done so, it would have lowered its Medicare reimbursement entitlements by approximately three million dollars.

On May 6, 2004, the Office of Inspector General (OIG) for the DHHS determined that Kindred (and other hospitals) improperly classified the pool payments as Medicaid revenue, instead of as reductions of the FRA tax expense. Following the OIG's recommendation, the CMS instructed Kindred to reclassify the pool payments as refunds to be offset against the FRA tax expense. Kindred appealed the decision to the Provider Reimbursement Review Board, which reversed the adjustments, finding them inconsistent with the facts, Medicare laws, and program guidance. The CMS Administrator (Administrator), however, reversed the Board's decision and reinstated the adjustments. Kindred appealed to the district court, which affirmed the Administrator's decision. The district court found that the decision was not contrary to law, was supported by factual evidence, and was not otherwise arbitrary, capricious or an abuse of its discretion. Kindred Hosps. East, LLC v. Sebelius, No. 10-00073-CV-W-HFS, 2011 WL 4729735 (W.D. Mo. Oct. 5, 2011). However, all parties agree[4] there was a mathematical error in the agency's decision and the district court ordered the agency to correct that error. Kindred appeals.

413.130(i)(5) ("Taxes not related to patient care, such as income taxes, are not allowable, and are therefore not included among either capital-related or operating costs."). It makes some sense to include this as a Medicare cost, however, as we previously noted the FRA tax is imposed upon all hospitals and therefore is arguably a cost necessarily incurred in the efficient delivery of health services as described by 42 U.S.C. § 1395x(v)(1)(A).

[4]The parties agree that a mathematical error exists in the 2002 Kindred–St. Louis Intermediary worksheet, as certain payments were shown as positive that should have been categorized in parentheses as negative amounts.

## II. DISCUSSION

We review the Administrator's decision under the same standard as the district court, and will reverse an agency decision only if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence. 5 U.S.C. § 706. We afford substantial deference to an agency's interpretation of its own regulations, particularly in a case like this that involves "a complex and highly technical regulatory program" such as Medicare, which requires substantial expertise and entails "the exercise of judgment grounded in policy concerns." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (quotation omitted).

The crux of the Administrator's decision is that because Kindred is effectively reimbursed for its FRA taxes by the pool payment, the Medicare costs it claimed for payment of the tax are not "cost[s] actually incurred" as required under 42 U.S.C. § 1395x(v)(1)(A). Boiled down, the issue is, do payments from the pool reduce a Medicare provider's costs actually incurred? And more specifically in this case, was the agency's affirmative answer to this question arbitrary, capricious, contrary to law or unsupported by substantial evidence?

Kindred argues that the Administrator's decision is contrary to law, and, curiously, asks us to look to a one-sentence definition of "refund" in 42 C.F.R. § 413.98(b)(3) to sustain this conclusion. This particular regulation states that "[r]efunds are amounts paid back or a credit allowed on account of an overcollection." Id. Kindred argues that there has been no overcollection and consequently, there cannot have been a refund. However, the Administrator's decision cannot be so narrowly cabined. In reading the entirety of the regulation, it indicates that "refunds of previous expense payments are reductions of the related expense." Id. § 413.98(a). Because there was a true reduction in Kindred's costs incurred because of the pool, the payments it received from the pool looked like refunds, acted like refunds, and were appropriately treated as such, regardless of the label. As the district court noted,

-6-

"[a]lthough examining the inflow and outflow of cash payments and the identity of the payor and payee will ordinarily establish the cost actually incurred, it will not necessarily always do so and Kindred's argument ignores the economic impact of participating in the pooling arrangement." Kindred, 2011 WL 4729735, at *5. See, e.g., Sta-Home Home Health Agency Inc. v. Shalala, 34 F.3d 305, 309 (5th Cir. 1994) (upholding Administrator's decision that employee-donated salary on the Medicare cost report was effectively a refund, and holding that the hospital's argument that no refund could occur without overcollection was "artful grammatical analysis").

Accordingly, rather than simply labeling the pool payments as "refunds," the Administrator analogized the payments as refunds, noting they were reductions of Kindred's reimbursable expenses. This was an entirely reasonable interpretation of its regulations and statutes. And it would be rather a small view of the complex Medicare and Medicaid statutes and regulations at issue to hold that the one-sentence definition of refund in § 413.98(b)(3) was the sole basis for the Administrator's authority to characterize the pool payments at issue in this case. See Abbott-Nw. Hosp., Inc. v. Schweiker, 698 F.2d 336, 340-41 (8th Cir. 1983) (rejecting the hospital's argument that an interest-income offset regulation was the exclusive source of the agency's authority to offset such income in calculating provider reimbursements, especially when viewing the entirety of the regulations and complex statutory scheme). Instead, the Administrator has general statutory authority under 42 U.S.C. § 1395x to deny reimbursement for costs that a provider did not actually incur. Schweiker, 698 F.2d at 342 ("This statute constrains the Secretary to reimburse a provider for only those costs actually incurred in providing services."). The Administrator acted within that statutory authority to scrutinize the substance of the relationship between the FRA tax and the pool payments to determine whether there was a Medicare reimbursable cost. See, e.g., Creighton Omaha Reg'l Health Care Corp. v. Sullivan, 950 F.2d 563, 566 (8th Cir. 1991) (affirming the agency's determination that interest payments were not reimbursable from the Medicare

program where another government program already reimbursed the payments, so as not to "pay the Hospital twice for the same expense").

Kindred also argues that the Administrator should not have relied upon the Provider Reimbursement Manual (PRM) in making its decision. Kindred claims the manual is contrary to the regulations and it addresses record keeping requirements, not reimbursement principles. The section relied upon by the Administrator, § 2302 of the PRM, defines "applicable credits" as "those receipts or types of transactions which offset or reduce expense items that are allocable to cost centers as direct or indirect costs." PRM, CMS-Pub. 15-1, § 2302.5 Assuming arguendo that this argument might have some merit if the manual was the Administrator's sole source of authority in making its decision, we note that the manual was cited only as "additional guidance" about items that serve to reduce expenses listed on a cost report for reimbursement. Accordingly, we reject Kindred's attempts to pigeonhole the Administrator's decision as contrary to its own regulations or improperly reliant on inappropriate sources of authority. Instead, our review of the Administrator's decision reflects that it was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Instead it was a reasonable decision based upon its authority in 42 U.S.C. § 1395x that payments from the pool functionally reduce Kindred's Medicare costs.

Kindred finally argues that the pool payments were actually donations or unrestricted grants from one hospital to another, and that there is no evidentiary support in the record for the Administrator's decision to the contrary. The district court found evidentiary support for this finding in the fact that the hospitals reported the pool payments as revenue, rather than gifts or grants. Further, it found that the payments were byproducts of the pool contract, undermining the donation theory because the MSC, not the hospitals, determined the amounts to be paid from the pool to each individual hospital. We agree with the district court that there is substantial evidence in the record to support the notion that the pool payments were not donations or unrestricted grants from one hospital to another. And while the Administrator

could have accepted Kindred's version of the pooling arrangement as private donations between hospitals, the fact that the Administrator did not do so does not make the decision unsupported by substantial evidence.

## III.   CONCLUSION

Kindred's argument that there is no consequential relationship between the state FRA tax it pays and the pool payments it receives is, under the record before us, disingenuous. Closely following the well-reasoned opinion of the district court, we affirm the Administrator's decision.

_____