# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 20, 2020

Lyle W. Cayce
Clerk

No. 18-60592

BAPTIST MEMORIAL HOSPITAL - GOLDEN TRIANGLE,
INCORPORATED; CALHOUN HEALTH SERVICES; DELTA REGIONAL
MEDICAL CENTER; MERIT HEALTH BATESVILLE, formerly known as
Tri-Lakes Medical Center, Mississippi; BAPTIST MEDICAL CENTER,
INCORPORATED; SAINT DOMINIC-JACKSON MEMORIAL HOSPITAL;
TISHOMINGO HEALTH SERVICES, INCORPORATED; GRENADA LAKE
MEDICAL CENTER,

   Plaintiffs - Appellees

v.

ALEX M. AZAR, II, SECRETARY, U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; SEEMA VERMA, in her official capacity as
Administrator, Centers for Medicare and Medicaid Services; CENTERS FOR
MEDICARE AND MEDICAID SERVICES,

   Defendants - Appellants

Appeal from the United States District Court
for the Southern District of Mississippi

Before HIGGINBOTHAM, DENNIS, and HO, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

  The Medicaid Act provides each state with a fixed pool of funds to make
supplemental payments to hospitals that serve a disproportionate share of
indigent patients. These "disproportionate share hospital" ("DSH") payments
are limited to a hospital's "costs incurred" in caring for indigent patients. The

18-60592

Secretary of the United States Department of Health and Human Services (the "Secretary") has significant discretion to determine how these costs are calculated. In 2017, the Secretary issued a final rule (the "2017 Rule") clarifying that hospitals' "costs incurred" are net of payments from third parties, like Medicare and private insurers.[1]

Eight Mississippi hospitals (the "Hospitals") challenged the 2017 Rule, contending that its definition of "costs incurred" conflicts with the Medicaid Act. The district court granted summary judgment for the Hospitals and enjoined enforcement of the 2017 Rule. The Secretary appealed. As have the three other circuit courts to consider the issue, we conclude that the 2017 Rule was consistent with the Act. We reverse.

**I.**

Medicaid is a joint state-federal program that pays medical expenses for low-income patients.[2] Each state administers its own program, but is subject to federal standards and oversight as a condition of receiving federal funding for a portion of its costs.[3] The care of Medicaid patients and the uninsured present financial challenges for hospitals serving a disproportionate number of these patients. In 1981, Congress authorized states to make the supplemental payments to "disproportionate share hospitals" to offset their losses on Medicaid and uninsured patients.[4] To finance these DSH payments, the Medicaid Act annually provides each state with a fixed pool of funds.[5]

---

[1] *See* Medicaid Program; Disproportionate Share Hospital Payments—Treatment of Third Party Payers in Calculating Uncompensated Care Costs, 82 Fed. Reg. 16,114 (2017) ("2017 Rule").

[2] 42 U.S.C. §§ 1396-1, 1396a.

[3] *Id.* § 1396b(a)(1).

[4] *See* H.R. REP. NO. 103–111, at 211 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 378, 538 (DSH payments "assist those facilities with high volumes of Medicaid patients in meeting the costs of providing care to the uninsured patients that they serve[.]").

[5] 42 U.S.C. § 1396r-4(f).

18-60592

In the early 1990s, some states were reportedly making DSH payments to hospitals "in amounts that exceed the net costs, and in some instances the total costs, of operating the facilities."[6] So in 1993 Congress imposed a "hospital-specific limit" on annual DSH payments to each hospital.[7] Under the limit, payments are capped at a hospital's "costs incurred" by serving Medicaid-eligible and uninsured patients, net of other Medicaid payments and payments from uninsured patients.[8]

In 2010, the Centers for Medicare and Medicaid Services ("CMS") issued guidance clarifying that the "costs incurred" are also net of payments from third parties (e.g., Medicare, private health insurance) for serving indigent patients.[9] Some patients are covered by Medicaid and a third party. In such cases, Medicaid is the "payer of last resort," meaning that typically only the third party pays the hospital. For example, when an individual enrolled in both Medicaid and Medicare has a hospital stay, typically only Medicare will pay for the stay. Under the 2010 guidance, when a third party reimburses a hospital for serving a Medicaid patient, the third-party payments are excluded from the "costs incurred."

After hospitals filed suits around the country, four courts of appeals held that the guidance represented a policy change and enjoined CMS from enforcing it.[10] With these decisions, CMS withdrew the guidance, effective

---

[6] H.R. REP. NO. 103–111, at 211, 1993 U.S.C.C.A.N. at 538.

[7] Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103–66, § 13621(b), 107 Stat. 66, 630 (1993).

[8] 42 U.S.C. § 1396r-4(g)(1)(A).

[9] *See* CMS, *Additional Information on the DSH Reporting and Audit Requirements*, at 18 (2018), https://www.medicaid.gov/sites/ default/ files/2020-01/part-1-additional-info-on-dsh-reporting-and-auditing.pdf.

[10] *Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1037 (6th Cir. 2018); *Children's Health Care v. CMS*, 900 F.3d 1022 (8th Cir. 2018); *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615 (4th Cir. 2018); *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62 (1st Cir. 2018).

18-60592

December 30, 2018.[11] Meanwhile, in April 2017, the Secretary promulgated the 2017 Rule, clarifying that "costs incurred" are net of third-party payments. That is, the 2017 Rule implements the same policy as the rescinded guidance.[12]

The Hospitals sued the Secretary, claiming the 2017 Rule exceeds his authority in violation of 5 U.S.C. § 706(2)(C). The district court agreed, relying almost entirely on *Children's Hospital Association of Texas v. Azar*, a district court decision invalidating the 2017 Rule.[13] After the Secretary appealed and the parties briefed this case, the D.C. Circuit overturned the district court decision in *Children's Hospital* and upheld the 2017 Rule.[14]

## II.

In reviewing a challenge to an administrative agency's statutory construction in a final rule, we apply *Chevron*'s two-step framework.[15] We first employ the "traditional tools of statutory construction" to determine "whether Congress has spoken to the precise question at issue."[16] "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[17] But if "the statute is silent or ambiguous with respect to the specific issue," we must defer to the agency's interpretation so long as it "is based on a permissible construction of the statute."[18] We also must defer when the statute expressly delegates an agency authority "to elucidate a specific provision of the statute

---

[11] *See* CMS, *Additional Information on the DSH Reporting and Audit Requirements* (2018), https://www.medicaid.gov/sites/default/files/2020-01/part-1-additional-info-on-dsh-reporting-and-auditing.pdf (announcing withdrawal of FAQ No. 33 and No. 34 as of December 30, 2018).

[12] Treatment of Third Party Payers, 82 Fed. Reg. 16,114.

[13] 300 F. Supp. 3d 190 (D.D.C. 2018).

[14] *Children's Hosp. Ass'n of Tex. v. Azar*, 933 F.3d 764 (D.C. Cir. 2019).

[15] *Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

[16] *Id.* at 842, 843 n.9.

[17] *Id.* at 842–43.

[18] *Id.* at 843.

by regulation."[19] The agency's "legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."[20]

### III.

The parties dispute the proper method for calculating the hospital-specific limit for annual DSH payments. The Medicaid Act sets the hospital-specific limit at:

> the costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section, and by uninsured patients) by the hospital to individuals who either are eligible for medical assistance under the State plan or have no health insurance (or other source of third party coverage) for services provided during the year.[21]

Under the 2017 Rule, "costs incurred" are also net of payments from third-party payers, such as Medicare and private insurers. The Secretary asserts that its Rule is consistent with the statute's ambiguous language. The Hospitals disagree, arguing that the Medicaid Act unambiguously specifies the method for calculating the hospital-specific limits, and that method does not account for payments from third parties.

Section 1396r-4(g)(1)(A) expressly delegates gap-filling authority to the Secretary through the "as determined by the Secretary" clause.[22] The Hospitals do not dispute this point, instead arguing that the gap is narrow and the statute is clear. As they see it, the hospital-specific limit is set at a hospital's gross costs net of other Medicaid payments and payments made by uninsured

---

[19] *Id.*

[20] *Id.*

[21] 42 U.S.C. § 1396r-4(g)(1)(A).

[22] *See Children's Hosp. Ass'n of Tex.*, 933 F.3d at 770; *Tenn. Hosp. Ass'n,* 908 F.3d at 1039 (quoting *Chevron,* 467 U.S. at 843–44) (concluding that the phrase "as determined by the Secretary" represented an "'express delegation of authority to the agency to elucidate a specific provision of the [Medicare] statute by regulation'").

patients, and the Secretary only has discretion to determine the calculation of gross costs. In support of their reading of the Act, the Hospitals marshal several arguments. We reject each one.

First, we cannot agree that the ordinary meaning and dictionary definitions of "costs" and "payments" render the disputed language unambiguous. Able judges employing these tools have reached opposing interpretations of this provision.[23] As the Supreme Court recognized, the word "cost" is "a chameleon," a "virtually meaningless term" with a "protean" nature.[24] Agencies therefore "have broad methodological leeway" to interpret the word,[25] and courts have repeatedly upheld the Secretary's authority to account for offsetting payments when construing "costs" or "costs incurred."[26]

We are also unpersuaded by the Hospitals' argument that the statute draws a "clear line" between costs and payments. In their view, the statute grants the Secretary discretion to determine the calculation of gross costs, but

---

[23] *Compare Mo. Hosp. Ass'n v. Azar*, 941 F.3d 896, 901 (8th Cir. 2019) (Stras, J., concurring in the judgment) (citing THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 891 (5th ed. 2016) and WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1146 (2002)) (concluding that the 2017 Rule is consistent with the plain meaning of the text), *with Tenn. Hosp. Ass'n*, 908 F.3d at 1048 (Kethledge, J., concurring in the judgment) (citing OXFORD ENGLISH DICTIONARY (online ed. 2018)) (concluding that CMS's 2010 guidance, which pursued the same policy as the 2017 Rule, violated the plain meaning of the text).

[24] *Verizon Commc'ns, Inc. v. FCC*, 535 U.S. 467, 500–01 (2002) (internal quotations omitted).

[25] *Id.* at 500.

[26] *See Dana–Farber Cancer Inst. v. Hargan*, 878 F.3d 336, 341 (D.C. Cir. 2017) (deferring to agency's determination that a provider's "'actually incurred' cost" of tax liability must reflect offsetting payments that "reduc[e] the cost" of the taxes); *Abraham Lincoln Mem'l Hosp. v. Sebelius*, 698 F.3d 536, 549–50 (7th Cir. 2012) (explaining that CMS policy requiring providers to offset refunds is consistent with the statutory directive limiting reimbursement to "costs that are 'actually incurred'") (quoting 42 U.S.C. § 1395x(v)(1)(A)); *Kindred Hosps. E., LLC v. Sebelius*, 694 F.3d 924, 928–29 (8th Cir. 2012) (noting that hospital was "effectively reimbursed" for its taxes by an offsetting payment); *cf. Sta-Home Home Health Agency, Inc. v. Shalala*, 34 F.3d 305, 308–10 (5th Cir. 1994) (concluding that "amounts paid back" are refunds that CMS may offset because they were not "'costs actually incurred,'" as doing otherwise would "have the effect of inflating the provider's costs") (quoting 42 U.S.C. § 1395x(v)(1)(A)).

6

not to select payments to subtract from those costs. This argument "flies in the teeth of the statutory text."[27] Because "'costs incurred' are both 'as determined by the Secretary' and "net of payments under [Medicaid] and by uninsured patients[,] . . . the statute *requires* that some payments be considered in calculating a hospital's 'costs incurred.'"[28] For this reason, "costs incurred" refers to net costs, not gross costs. And because the statute does not direct the Secretary to exclude "only" payments from Medicaid and uninsured patients, it is within the Secretary's expressly delegated authority to interpret "costs incurred" to exclude other payments as well.[29]

We likewise reject the Hospitals' contention that Congress, by expressly excluding payments from Medicaid and the uninsured, meant to exclude only those payments and no others. The Hospitals rely on the canon of *Expressio Unius Est Exclusio Alterius*, which provides that "expressing one item of [an] associated group or series excludes another left unmentioned."[30] This canon "applies only when circumstances support a sensible inference that the term left out must have been meant to be excluded."[31] Such an inference is not warranted here. Congress may have wanted to ensure the deduction of "the most common sources of payment"—Medicaid and the uninsured—while allowing the Secretary "to decide whether less-common sources of payment should be [deducted] as well."[32] Affording the Secretary this discretion makes

---

[27] *Children's Hosp. Ass'n of Texas*, 933 F.3d at 772.

[28] *Id.*

[29] *See id.* at 770 ("Although the statute establishes that payments by Medicaid and the uninsured must be considered, it nowhere states that those are the *only* payments that may be considered.") (original emphases omitted and emphasis added); *see also Mo. Hosp. Ass'n,* 941 F.3d at 899 (same, quoting *Children's Hosp. Ass'n of Tex.*, 933 F.3d at 770); *Tenn. Hosp. Ass'n*, 908 F.3d at 1038 ("[T]he statute does not instruct CMS to deduct only those payments from the determination of costs; the fact that certain payments must be deducted from costs does not mean that other payments cannot be.").

[30] *NLRB v. Sw. Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (alteration in original).

[31] *Id.*

[32] *Children's Hosp. Ass'n of Tex.*, 933 F.3d at 771.

sense given the array of private and public payers (Medicare, private health insurance, TRICARE, etc.) and the potential for unforeseeable changes in how these payers reimburse hospitals.[33]

We also reject the Hospitals' argument that the express exclusion of third-party payments in a related Medicaid provision indicates that Congress chose not to deduct third-party payments in § 1396r-4(g)(1)(A). They point to § 1396r-4(g)(2)(A), which allowed states to make extra DSH payments to certain hospitals until 1995. But states had to certify that the extra payments—i.e., payments in excess of the hospital-specific limit "as described in paragraph (g)(1)(A)"—were "used for health services."[34] Under subsection (g)(2), the amount "used for health services" excluded "any amounts received . . . from third party payors (not including the State plan under this subchapter)."[35] The Hospitals claim that "it is compelling that Congress did not include payments by third-party insurers in subsection (g)(1), despite excluding precisely such payments in . . . subsection (g)(2)."

The Supreme Court has explained that the Hospitals' presumption— "that the presence of a phrase in one provision and its absence in another reveals Congress's design—grows weaker with each difference in the formulation of the provisions under inspection."[36] Here, there are significant differences between subsections (g)(1)(A) and (g)(2)(A).[37] Unlike subsection

---

[33] For example, in 2003, Congress appropriated funds to reimburse hospitals for providing emergency care to undocumented aliens. Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108–173, § 1011, 117 Stat. 2066, 2432. In 2008, CMS clarified that these payments are excluded from the calculation of the Medicaid shortfall. *See* Medicaid Program; Disproportionate Share Hospital Payments, 73 Fed. Reg. 77,904, 77,912 (Dec. 19, 2008).

[34] 42 U.S.C. § 1396r-4(g)(2)(A).

[35] *Id.*

[36] *Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 435-36 (2002).

[37] *Children's Hosp. Ass'n of Tex.*, 933 F.3d at 772 (describing these subsections as "fundamentally different").

(g)(1)(A), subsection (g)(2)(A) did not exclude third-party payments from the limit on payments to a hospital; rather, it required states to account for third-party payments when determining whether the extra DSH payments were "used for health services." Further, we see "no tension . . . in Congress requiring third-party payment deductions in subsection (g)(2)(A) and allowing third-party payment deductions in subsection (g)(1)(A)."[38] Because "[t]he DSH payments provided for in (g)(2)(A) are above and beyond those mandated by (g)(1)(A)," Congress may have wanted to impose tighter limits on these extra payments "while giving CMS more discretion to calibrate the appropriate cap on the 'standard' DSH payments discussed in (g)(1)(A)."[39]

Finally, we see no basis for the Hospitals' argument that the 2017 Rule conflicts with the statutory purpose of the hospital-specific limit. The Hospitals contend that the DSH payments are designed to offset the financial burden of treating not only Medicaid patients but also uninsured patients. They rely heavily on a committee report to the 1987 bill creating the Medicaid DSH payments. It explained that the DSH payments are meant "*at a minimum* [to] meet the needs of those facilities which . . . serve a large number of Medicaid-eligible and uninsured patients who other providers view as financially undesirable."[40] It signifies that when Congress created the hospital-specific limit in 1993, that same House committee was "concerned by reports" of states making DSH payments "in amounts that exceed the net costs, and in some instances the total costs, of operating the facilities."[41] "In essence, Congress was concerned that hospitals were double dipping by collecting DSH payments

---

[38] *Tenn. Hosp. Ass'n*, 908 F.3d at 1039.

[39] *Id.*

[40] H.R. REP. NO. 100–391(I) at 524 (1987), *as reprinted in* 1987 U.S.C.C.A.N. 2313–1, 2313–344 (emphasis added).

[41] H.R. REP. NO. 103–111, at 211, 1993 U.S.C.C.A.N. at 538.

to cover costs that had already been reimbursed."[42] The 2017 Rule addresses this concern by safeguarding against states paying hospitals for costs that have already been reimbursed by a third party.[43] It "ensures that DSH payments will go to hospitals that have been compensated least and are thus most in need."[44] We conclude that the 2017 Rule is a reasonable reading of the Medicaid Act and does not violate § 706(2)(C).

## IV.

For these reasons, we reverse and remand for further proceedings consistent with this opinion.

---

[42] *Tenn. Hosp. Ass'n*, 908 F.3d at 1040.

[43] *See id.* at 1039–40; *Children's Hosp. Ass'n of Tex.*, 933 F.3d at 772.

[44] *Children's Hosp. Ass'n of Tex.*, 933 F.3d at 772.